UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYNARD WILLIAMS,

        Petitioner,

v.                                                    CASE NO. 2:15-CV-13280
                                                    HONORABLE VICTORIA A. ROBERTS

BONITA HOFFNER,

        Respondent.
_____/

**OPINION AND ORDER GRANTING RESPONDENT'S MOTION FOR
DISMISSAL, DISMISSING THE PETITION FOR A WRIT OF
HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY,
AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

**I.  INTRODUCTION**

Michigan prisoner Raynard Williams ("Petitioner") has filed a Petition for a Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254 alleging that he is being held in custody in violation of his constitutional rights.  Petitioner is serving a sentence of life imprisonment without the possibility of parole for first-degree felony murder, which was imposed following a jury trial in the Wayne County Circuit Court in 1995.  The matter is before the Court on Respondent's Motion for Dismissal seeking dismissal of the Petition as untimely under the one-year statute of limitations applicable to federal habeas actions.  Having reviewed the matter, the Court concludes that the Petition is untimely and must be dismissed for failure to comply with the one-year statute of limitations set forth at 28 U.S.C. § 2244(d).  The Court also concludes that a Certificate of Appealability and leave to proceed in forma pauperis on appeal should be denied.

## II.  FACTS AND PROCEDURAL HISTORY

Petitioner's conviction arises from his conduct in robbing and stabbing his grandmother to death at their two-flat residence in Detroit, Michigan on November 3, 1994.  The Court adopts Petitioner's statement of facts summarizing the trial testimony to the extent that it is consistent with the record.  Those facts are as follows:

> At trial, the first witness was Laning Davidson, the Wayne County Medical Examiner. Dr. Davidson testified that he performed the autopsy of the Decedent, Ruth Williams, and concluded that she died as a result of multiple stab wounds to the neck (T, Vol I, pp 135-139).
>
> Willa Mae Welch testified that she is the sister of the Decedent and that she identified her sister's body at the morgue (T, Vol I, p 152). She further testified that the Defendant was the Decedent's grandson and that he lived with the Decedent and her children (T, Vol I, p 153).
>
> Lt. Edward Langewicz of the Detroit Police Department testified that he responded to a radio run which indicated that an elderly woman had been stabbed at 13913 Arlington, in the City of Detroit (T, Vol I, pp 156-157). Upon arrival, he was led to the rear of the dwelling by an individual named Katrina Harvey and two children (T, Vol I, pp 159-160). After entering the kitchen area, he observed Mr. Williams holding a towel to the neck area of the Decedent as he told her that she would be alright (T, Vol I, p 161). Mr. Williams subsequently informed Lt. Langewicz that he and his family had returned from McDonald's, and that they observed two black males exiting the dwelling; whereupon he attempted to detain them, but was cut by one of the black males with a knife (T, Vol I, pp 163-164).
>
> On cross-exam, Lt. Langewicz indicated that Mr. Williams appeared distraught, and smelled of alcohol (T, Vol I, pp 171-172). He also indicated that Katrina Harvey and Reginald Harvey informed him that they also saw two subjects exit the dwelling and that Mr. Williams struggled with the two men (T, Vol I, pp 179-180).
>
> Sgt. Michael Passage testified that he went with Lt. Langewicz and observed the Decedent lying on the kitchen floor in a pool of blood (T, Vol I, pp 181-182). He further indicated that Mr. Williams told him that some people broke into the house and he observed one of the individuals with a knife (T, Vol I, pp 184-185). Sgt. Passage also indicated that Mr. Williams smelled of alcohol (T, Vol I, p 185).
>
> * * *
>
> Officer Debra Gaines, testified that she arrived at the scene, observed Katrina Harvey and Mr. Williams sitting on the front porch, and detected the smell of alcohol on Mr.

Williams as she spoke to him (T, Vol I, pp 190-191). She indicated that Mr. Williams informed her that the perpetrators fled south into the alley; however, she observed that the ground area was very muddy but did not contain any footprint tracks (T, Vol I, pp 192-193).

Officer Robert Collinash, the evidence technician, testified that he took photographs of the residence and prepared a sketch of the first-floor of the dwelling (T, Vol I, p 197). He indicated that he did not notice any evidence of forced entry into the home (T, Vol I, p 202). He further indicated that no useable fingerprints were found. In addition, he testified that a bed sheet and a window curtain were collected because they appeared to have suspected blood on them. He also collected a sample of suspected blood from a garage door (T, Vol I, pp 204-205). A knife was also discovered at the rear property line of the residence (T, Vol I, pp 207-208).

On cross-exam, Officer Collinash indicated that there were no blood stains observed on the knife that was discovered behind the residence (T, Vol I, p 217).

Officer Hayden Dannug of the evidence lab testified that a black plastic handled kitchen knife tested negative for the presence of blood (T, Vol II, p 7), and that two knives that were taken from the residence were tested for blood and came up negative (T, Vol II, p 9). A bed sheet, a ladies sports jacket, a floral print curtain, and a green wash cloth taken from the upstairs bathroom of the residence were tested and found to contain blood (T, Vol II, pp 7; 9). Evidence taken from a garage door, as well as stains on a pair of brown jeans, a blue sweatshirt, and a floral print bandana, were found to contain blood (T, Vol II, pp 9-10). A sample of blood was also taken from Mr. Williams at the County Jail and placed on evidence (T, Vol II, p 10).

Reginald Harvey, Mr. Williams' 10-year old stepson, testified that he lived upstairs in the residence with Mr. Williams and his mother, Katrina Harvey (T, Vol II, p 15). He further testified that Mr. Williams and his mother were crack users and that on the evening in question, his mother asked the Decedent for five dollars (T, Vol II, p 23). Later in the evening, he testified that he observed Mr. Williams go downstairs, and heard the Decedent say, "Stop Ray, stop." (T, Vol II, p 25). He claimed that he observed Mr. Williams return upstairs with blood on his hands (T, Vol II, p 26), and, according to Mr. Harvey, Mr. Williams told him to tell the Police that they observed an individual come out of the flat and that this individual stabbed Mr. Williams in his arm (T, Vol II, p 27). He indicated that the story he told the Police was a lie because he was afraid for his life (T, Vol II, pp 27-28).

On cross-exam, Mr. Harvey indicated that the statement he made to the Police the next day was the truth (T, Vol II, p 31). However, although he claimed that he informed the Police that he heard the Decedent say, "Stop Ray, stop," he acknowledged that those words are not in his statement to the Police (T, Vol II, p 32).

3

> Investigator Isaiah Smith testified that he took a statement from Mr. Williams at approximately 10:00 a.m. in the interrogation room (T, Vol II, p 39). Ultimately Mr. Williams gave a statement at 10:10 a.m. on November 3, 1995 (T, Vol II, p 41). At that time, Ms. Katrina Harvey was also being interviewed in a separate room (T, Vol II, p 42). After revealing what Ms. Harvey told to the other investigator, Investigator Smith went back to re-interview Mr. Williams; whereupon Mr. Williams gave a second statement which implicated him in the crime (T, Vol II, pp 43-44). The second statement which incriminated Mr. Williams was ultimately read into the record before the jury (T, Vol II, pp 47-56). In addition, according to Investigator Smith, Mr. Williams indicated that he could point out where he threw the murder weapon to the Police (T, Vol II, p 56). In the company of officers, according to Investigator Smith, Mr. Williams pointed to a knife that was laying in a vacant field and indicated that the knife was the murder weapon (T, Vol II, pp 56-57). The knife was introduced as People's Exhibit No. 12 (T, Vol II, p 57).
>
> On cross-exam, Investigator Smith indicated that Mr. Williams told him that within the last 24 hours he had ingested large amounts of alcohol and crack cocaine (T, Vol II, pp 59-60). Although Investigator Smith indicated that Mr. Williams was not under arrest at the time he gave his first statement, he indicated that he handcuffed Mr. Williams to the interrogation table when he left the room (T, Vol II, p 61).
>
> Sgt. LaVerne Gallant, Jr., of the Detroit Police Department, testified that he was the Officer in charge of the case and that he went to the homicide scene to check for evidence of a break-in (T, Vol II, pp 67-68). The blood he observed at the scene stopped at the back steps and did not lead away from the house in any direction (T, Vol II, p 70). He further indicated that he observed a knife on top of a pan of soup and asked Katrina Harvey about the knife; whereupon she responded that it was used to cut onions. However, upon checking trash and other areas of the house, no onions or onion shells were observed (T, Vol II, pp 70-72). Finally, he indicated that no fingerprint evidence was used to determine or identify the murder weapon because Mr. Williams pointed the murder weapon out to the officers (T, Vol II, p 75).

Pet. Brf., pp. 2-7. At the close of trial, the jury convicted Petitioner of first-degree felony murder and armed robbery. The trial court subsequently sentenced him to concurrent terms of life imprisonment without parole and 20 to 40 years imprisonment on those convictions.

Following sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising claims concerning the admission of his confession to police, double jeopardy, and the effectiveness of trial counsel. The Michigan Court of Appeals vacated his armed robbery conviction

4

and sentence on double jeopardy grounds, but denied relief on the other claims and affirmed his first-degree felony murder conviction and sentence. *People v. Williams*, No. 189621, 1997 WL 33344124 (Mich. Ct. App. Aug. 5, 1997). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. Williams*, 459 Mich. 852, 584 N.W.2d 587 (Aug. 28, 1998).

In March, 2000, Petitioner filed a motion for relief from judgment with the state trial court raising claims concerning the admission of his police statement, the effectiveness of trial counsel, and the police and prosecution's alleged coercion of Reginald Harvey and use of his perjured testimony at trial. The court denied the motion finding that the claims which were previously raised on appeal were barred, that the remaining claims lacked merit, and that Petitioner failed to establish good cause under Michigan Court Rule 6.508(D)(3) for not raising those claims on direct appeal. *People v. Williams*, No. 94-012704 (Wayne Co. Cir. Ct. Aug. 23, 2000). Petitioner filed a delayed application for leave to appeal with the Michigan Court of Appeals, which was denied pursuant to Michigan Court Rule 6.508(D). *People v. Williams*, No. 235734 (Mich. Ct. App. Nov. 14, 2001). Petitioner then filed a delayed application for leave to appeal with the Michigan Supreme Court, which was similarly denied. *People v. Williams*, 466 Mich. 885, 646 N.W.2d 474 (June 24, 2002).

On July 9, 2012, Petitioner filed a second motion for relief from judgment (entitled as a motion for new trial) with the state trial court presenting the "newly-discovered" evidence of Reginald Harvey's recanting affidavit and asserting that the police and the prosecution coerced Harvey into testifying falsely at trial. The trial court denied the motion finding that Harvey's recantation was "totally incredible and unbelievable" and inconsistent with Petitioner's confession. *People v. Williams*, No. 94-012704-01-FC (Wayne Co. Cir. Ct. Nov. 16, 2012). Petitioner filed a

delayed application for leave to appeal with the Michigan Court of Appeals, which was denied pursuant to Michigan Court Rule 6.508(D). *People v. Williams*, No. 315833 (Mich. Ct. App. Oct. 25, 2013). Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was similarly denied. *People v. Williams*, 495 Mich. 993, 845 N.W.2d 120 (April 28, 2014). The Michigan Supreme Court also denied reconsideration. *People v. Williams*, 496 Mich. 869, 849 N.W.2d 343 (July 29, 2014).

Petitioner, through counsel, filed the instant Petition on September 16, 2015. He asserts that the police and the prosecution coerced Reginald Harvey into providing false testimony against him at trial in violation of his due process rights. Respondent now seeks dismissal of the Petition asserting that it is untimely. In reply, Petitioner contends that the Petition is timely and/or that he is entitled to equitable tolling of the one-year period.

### III. DISCUSSION

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, became effective on April 24, 1996. The AEDPA governs the filing date for this action because Petitioner filed his Petition after the AEDPA's effective date. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA includes a one-year period of limitations for habeas petitions brought by prisoners challenging state court judgments. The statute provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d). A habeas petition filed outside the proscribed time period must be dismissed. *See Isham v. Randle*, 226 F.3d 691, 694-95 (6th Cir. 2000) (dismissing case filed 13 days after the limitations period expired); *Wilson v. Birkett*, 192 F. Supp. 2d 763, 765 (E.D. Mich. 2002).

Petitioner's conviction became final after the AEDPA's April 24, 1996 effective date. The Michigan Supreme Court denied leave to appeal on direct appeal on August 28, 1998. Petitioner's conviction became final 90 days later, *see Jimenez v. Quarterman*, 555 U.S. 113, 120 (2009) (a conviction becomes final when "the time for filing a certiorari petition expires"); *Lawrence v. Florida*, 549 U.S. 327, 333 (2007); S. Ct. R. 13(1), on or about November 26, 1998. Accordingly, Petitioner was required to seek federal habeas relief by November 26, 1999, excluding any time during which a properly filed application for state post-conviction or collateral review was pending in accordance with 28 U.S.C. § 2244(d)(2).

Petitioner filed his first motion for relief from judgment with the state trial court in March, 2000 and filed his second motion for relief from judgment with the state trial court in July, 2012. Thus, the one-year limitations period expired well before Petitioner sought state post-conviction review. A state court post-conviction motion that is filed following the expiration of the limitations period cannot toll that period because there is no period remaining to be tolled. *Hargrove v.*

7

*Brigano*, 300 F.3d 717, 718 n. 1 (6th Cir. 2002); *Webster v. Moore*, 199 F.3d 1256, 1259 (11th Cir. 2000); *see also Jurado*, 337 F.3d at 641. Furthermore, the AEDPA's limitations period does not begin to run anew after the completion of state post-conviction proceedings. *Searcy v. Carter*, 246 F.3d 515, 519 (6th Cir. 2001).

Petitioner does not contend that the State created an impediment to the filing of his habeas action or that his habeas claim is based upon newly-created retroactively applicable rights which would warrant habeas relief. Rather, he asserts that his habeas claim, arising from Reginald Harvey's affidavits (original dated October 20, 2011 and amended dated April 17, 2012) is based upon newly-discovered facts.

With regard to newly-discovered evidence under 28 U.S.C. § 2244(d)(1)(D), the limitations period begins when the factual predicate for the claim could have been discovered through the exercise of due diligence, not when it was actually discovered by the petitioner. *Lott v. Coyle*, 261 F.3d 594, 605–06 (6th Cir. 2001); *Brooks v. McKee*, 307 F. Supp. 2d 902, 905-06 (E.D. Mich. 2004) (citing cases). The period begins when the petitioner knows or could have discovered the important facts for the claim, not when the petitioner recognizes the legal significance of those facts. *Brooks*, 307 F. Supp. 2d at 905-06. Moreover, the start of the limitations period "does not await the collection of evidence which supports the facts." *Id*. at 906. A habeas petitioner bears the burden of showing that he exercised due diligence in discovering the factual predicate for his claims. *DiCenzi v. Rose*, 452 F.3d 465, 471 (6th Cir. 2006).

Federal courts have applied these principles to cases involving recanting witness affidavits ruling that the limitations period begins when the petitioner knew or could have discovered that the witness was willing to recant his or her testimony, not when the affidavit is executed. *See, e.g.,*

8

*Bates v. Metrish*, No. 07-11073, 2010 WL 1286413, *9 (E.D. Mich. March 30, 2010) (citing cases); *Webb v. Bell*, No. 2:07-CV-12689, 2008 WL 2242616, *5 (E.D. Mich. May 30, 2008) (noting that date of notarized affidavit merely informs the court when it was signed, not when the witness recanted his testimony or whether the petitioner exercised due diligence); *accord Deloney v. McCann*, 229 F. App'x 419, 422 (7th Cir. 2007) (ruling that limitations period began when the petitioner became aware of relevant facts not when he obtained supporting evidence and noting that the petitioner did not argue that he was unaware of witness's recantation until he obtained her affidavit); *Fama v. Commissioner of Corr. Svs.*, 235 F.3d 804, 816 n. 10 (2d Cir. 2000) (noting that affidavit was not newly-discovered when signed in 1997 because affiant told petitioner of witness's admission of perjury in a 1995 letter); *Ajamu-Osagboro v. Patrick*, 620 F. Supp. 2d 701, 711-12 (E.D. Pa. 2009) (limitations period began to run when witness's sister contacted petitioner in prison and informed him witness was willing to recant); *Chism v. Johnson*, No. 3-99-CV-2412-BD, 2000 WL 256875, *2 (N.D. Tex. March 7, 2000) (rejecting argument that petitioner could not have discovered the factual predicate for his claim until witness executed recanting affidavit).

In this case, the record indicates that Petitioner knew of the factual basis for his coercion/perjured testimony claim, at the latest, at the time he filed his first motion for relief from judgment in March, 2000 because he included such a claim in that motion and subsequently submitted to the Michigan Supreme Court an affidavit from Wilma Patton (dated June 11, 2001) in which Patton stated that Reginald Harvey told her that he was pressured into changing his story and testifying against Petitioner at trial. Petitioner offers no explanation for why it took him more than 10 years to obtain an affidavit from Harvey himself. With the exercise of reasonable diligence, Petitioner could have obtained an affidavit from Harvey sooner to support his coercion/perjured

9

testimony claim. His habeas action is therefore untimely under 28 U.S.C. § 2244(d).

Alternatively, even if the statute of limitations period begins when, or is tolled until, Petitioner obtained Harvey's original recanting affidavit in 2011 or his amended recanting affidavit in 2012, his habeas action is still untimely. As to the original affidavit, Harvey signed it on October 20, 2011. The one-year period began running the next day and ran for about eight and a half months until Petitioner filed his state court motion for relief from judgment on July 9, 2012. The one-year period was then tolled while that motion and related appeals were pending in the state courts until the Michigan Supreme Court denied reconsideration on July 29, 2014. The one-year period then resumed running and expired about three and a half months later in November, 2014. Petitioner, however, did not file the instant Petition until September 16, 2015 – 10 months late.

As to the amended affidavit, Harvey signed it on April 17, 2012. The one-year period began running the next day and ran for over two and a half months until Petitioner filed his state court motion for relief from judgment on July 9, 2012. The one-year period was then tolled while that motion and related appeals were pending in the state courts until the Michigan Supreme Court denied reconsideration on July 29, 2014. The one-year period then resumed running and expired about nine and a half months later in May, 2015. Petitioner, however, did not file the instant Petition until September 16, 2015 - four months late. Under either scenario, his habeas action is untimely under 28 U.S.C. § 2244(d).

The United States Supreme Court has confirmed that the habeas statute of limitations is not a jurisdictional bar and is subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631, 645 (2010). The Supreme Court has further verified that a habeas petitioner is entitled to equitable tolling "only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary

10

circumstance stood in his way' and prevented timely filing." *Id*. at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *see also Robertson v. Simpson*, 624 F.3d 781, 783-84 (6th Cir. 2010). A petitioner has the burden of demonstrating that he is entitled to equitable tolling. *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004). "Typically, equitable tolling applied only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Jurado*, 337 F.3d at 642 (quoting *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560 (6th Cir. 2000)).

Petitioner makes no such showing. He fails to sufficiently explain why it took him 16 years after the expiration of the one-year statute of limitations period to seek federal habeas relief, particularly why it took him more than 10 years after learning that Reginald Harvey wanted to recant his trial testimony to obtain an affidavit from him and pursue collateral review in the state courts in 2012 and subsequently seek federal habeas relief. The fact that Petitioner is untrained in the law, may have been proceeding without a lawyer for a period of time, may have been mistaken about court filing requirements, or may have been unaware of the statute of limitations does not warrant tolling. *See Keeling v. Warden, Lebanon Corr. Inst*., 673 F.3d 452, 464 (6th Cir. 2012) (pro se status is not an extraordinary circumstance); *Allen*, 366 F.3d at 403 (ignorance of the law does not justify tolling); *Cobas v. Burgess*, 306 F.3d 441, 444 (6th Cir. 2002) (illiteracy is not a basis for equitable tolling); *Rodriguez v. Elo*, 195 F. Supp. 2d 934, 936 (E.D. Mich. 2002) (the law is "replete with instances which firmly establish that ignorance of the law, despite a litigant's pro se status, is no excuse for failure to follow established legal requirements); *Holloway v. Jones*, 166 F. Supp. 2d 1185, 1189 (E.D. Mich. 2001) (lack of professional legal assistance does not justify tolling); *Sperling v. White*, 30 F. Supp. 2d 1246, 1254 (C.D. Cal. 1998) (citing cases stating that ignorance

of the law, illiteracy, and lack of legal assistance do not justify tolling). Petitioner's contention that his habeas claim has merit also does not justify tolling the limitations period. *Holloway*, 166 F. Supp. 2d at 1191. Petitioner fails to establish that he is entitled to equitable tolling under *Holland*.

Both the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit have held that a credible claim of actual innocence may equitably toll the one-year statute of limitations. *McQuiggin v. Perkins*, _ U.S. _, 133 S. Ct. 1924, 1928 (2013); *Souter v. Jones*, 395 F.3d 577, 588-90 (6th Cir. 2005); *see also Holloway*, 166 F. Supp. 2d at 1190. As explained in *Souter*, to support a claim of actual innocence, a petitioner in a collateral proceeding "must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995)); *see also House v. Bell*, 547 U.S. 518, 537-39 (2006). A valid claim of actual innocence requires a petitioner "to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness account, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. Significantly, actual innocence means "factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623.

Petitioner asserts that he is actually innocent based upon Reginald Harvey's recantation. Affidavits by witnesses recanting their trial testimony, however, are viewed with extreme suspicion. *See McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007); *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001). Harvey's recanting affidavits are suspect and unreliable for several reasons. First, Harvey apparently did not indicate that he was willing to recant his trial testimony until five years after Petitioner's trial and did not execute his affidavits until 16 years after trial. Such a long

12

delay in coming forward renders his recantation inherently suspect. *Schlup*, 513 U.S. at 331; *Lewis v. Smith*, 110 F. App'x 351, 355 (6th Cir. 2004) (district court properly rejected as suspicious a witness' recanting affidavit made two years after trial); *Olson v. United States*, 989 F.2d 229, 231 (7th Cir. 1993) (recantation more than four years after trial testimony was dubious); *see also McQuiggan*, 133 S. Ct. at 1928 (stating that a court should consider "unjustifiable delay on a habeas petitioner's part ... as a factor in determining whether actual innocence has been reliably shown"). Second, Reginald Harvey is/was Petitioner's step-son. Affidavits by family members recanting trial testimony are also of questionable reliability. *See, e.g., Milton v. Secretary, Dep't of Corr.*, 347 F. App'x 528, 531-32 (11th Cir. 2009) (affidavits from family members or fellow inmates created after trial are not sufficiently reliable evidence to support a claim of actual innocence). Third, there is little evidence in the record to corroborate Harvey's claim that Petitioner was not involved in the crime. *See, e.g., Teagle v. Diguglielmo*, No. 08-2587, 2009 WL 1941983, *3 (3d Cir. June 11, 2009) (unpublished case stating that recantation of trial testimony was suspicious and untrustworthy and "did not, in the absence of additional corroborating evidence or circumstance, meet the standard of reliability contemplated by *Schlup*"); *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2005) (uncorroborated recantation is "even more unreliable" where trial testimony was consistent with other evidence and recantation was not). To be sure, Petitioner told the police that he stabbed his grandmother and his confession was admitted into evidence at trial. Given such circumstances, the Court finds that Reginald Harvey's recantation is untrustworthy and does not establish Petitioner's actual innocence.

Petitioner also cites newspaper articles describing Detroit police corruption in 2001 (some of which involved an investigator who participated in his case) in support of his actual innocence

13

claim. Such articles, however, do not refer to Petitioner's case nor do they establish his actual innocence of the crime at hand, which occurred several years earlier in 1994. Moreover, the fact that the police may have acted improperly in other cases does not mean that they did so in this case. In sum, neither the "newly-discovered" recanting affidavits from Reginald Harvey nor the Detroit police corruption newspaper articles demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted Petitioner of the crime. Petitioner is not entitled to equitable tolling of the one-year period. His Petition is untimely and must be dismissed.

## IV. CONCLUSION

Based upon the foregoing discussion, the Court concludes that Petitioner did not file his Petition within the one-year limitations period established by 28 U.S.C. § 2244(d), that he is not entitled to statutory or equitable tolling, and that the statute of limitations precludes review of his habeas claim. Accordingly, the Court **GRANTS** Respondent's Motion for Dismissal and **DISMISSES WITH PREJUDICE** the Petition for a Writ of Habeas Corpus.

Before Petitioner may appeal the Court's decision, a Certificate of Appealability must issue. 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b). A Certificate of Appealability may issue only if a habeas petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies habeas relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). When a court denies relief on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would

find it debatable whether the court was correct in its procedural ruling. *Id*. Jurists of reason would not find the Court's procedural ruling debatable. Accordingly, the Court **DENIES** a Certificate of Appealability. The Court also **DENIES** leave to proceed in forma pauperis on appeal as an appeal cannot be taken in good faith. *See* FED. R. APP. P. 24(a).

    **IT IS SO ORDERED**.

                                  S/Victoria A. Roberts
                                  VICTORIA A. ROBERTS
                                  UNITED STATES DISTRICT JUDGE

Dated: May 20, 2016